THE STATE OF OHIO, APPELLEE, *v.* JOHNSON, APPELLANT.

(No. 71-780—Decided July 19, 1972.)

108

110

*Mr. Simon L. Leis, Jr.,* prosecuting attorney, and *Mr. Robert K. Sachs,* for appellee.

*Mr. William F. Hopkins* and *Mr. James N. Perry,* for appellant.

I.

Brown, J. The defendant contends that the penalty of death is cruel and unusual punishment and therefore unconstitutional.

The United States Supreme Court, in *Furman* v. *Georgia* (decided June 29, 1972), 33 L. Ed. 2d 346, has held that the carrying out of a death penalty imposed at the discretion of the trier of the facts constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

*Under that holding, which we are required to follow, the infliction of the death penalty under the existing law of Ohio is now unconstitutional* (with the possible exception of the taking of the life or attempting to take the life of the President, Vice President, or a person in the line of succession to the presidency [R. C. 2901.09], or of the Governor or Lieutenant Governor [R. C. 2901.10], which statutes purport to impose a mandatory penalty of death).

We have reviewed the record of the proceedings in this case and find ample evidence of guilt of murder in the first degree.

II.

The defendant next asserts that he was denied due process of law because the state conducted three murder trials in three different courtrooms simultaneously, wherein defendant was tried at the same time as his codefendants Kassow and Leigh. This contention has no merit. Absent any showing in the record of prejudice occasioned by

the simultaneous trials, and absent defendant's demonstration of any necessity for his codefendants' trials to run seriatim, we find no error. *State* v. *Kassow, supra* (28 Ohio St. 2d 141). As was true in *Kassow,* there is nothing in the bill of exceptions or the record of this case which demonstrates that the defendant was prejudiced in any manner by conducting separate trials simultaneously in three separate courtrooms.

To the contrary, the entire procedure was designed to insure the defendants a fair trial by providing that one jury could not know what happened in one of the codefendant's cases.

### III.

The defendant next claims that he was denied due process of law because the composition of the special venire called for his trial was constituted in such a manner that all non-registered electors were systematically excluded for jury services. In the case at bar, the jury was summoned and constituted as required by R. C. 2945.18, 2945.-19, 2313.06 and 2313.08. Under this procedure, pursuant to R. C. 2313.06, jurors are only selected from among the electors of the county shown on either the pollbooks or registration lists for the next preceding general election.

It should be noted that although a juror is in effect required to have the qualifications of an *elector* he is not required to be a voter. Under Section 1, Article V of the Constitution, as it read at the time of defendant's trial, an elector was a citizen who had been a resident of the state for one year and of the county and ward for such time as has been provided by law, and who was over 21 years of age.

In assessing whether the exclusion of non-registered electors from jury duty violates defendant's right to due process of law, we ask the following questions:

1. Is the classification between registered and non-registered electors as a means of selection for jury duty one that is reasonable?

A state, within the limits from which it is not excluded by the Fourteenth Amendment to the Constitution of

the United States, may prescribe the qualifications of its jurors, and in so doing make discriminations. *Strauder v. West Virginia* (1879), 100 U. S. 303; *United States v. Roemig* (1943), 52 F. Supp. 857. The United States Constitution does not forbid the states from prescribing relevant qualifications for their jurors, and the states are free to confine this selection to citizens and to persons meeting specified qualifications of age and educational attainment. *Carter v. Greene County* (1970), 396 U. S. 320; *Brown v. Allen* (1953), 344 U. S. 443, 473; *Cassell v. Texas* (1950), 339 U. S. 282, 291; *Virginia v. Rives* (1880), 100 U. S. 313, 334-335; *Strauder v. West Virginia, supra,* at 310; *Neal v. Delaware* (1880), 103 U. S. 370, 386.

As stated in *United States v. Caci* (1968), 401 F. 2d 664, 671:

"* * * It is well established that the use of voter registration lists as the source of names of prospective jurors is not unlawful because it results in the exclusions of nonvoters. See *e. g., United States v. Kelly,* 349 F. 2d 720, 778 (2d Cir. 1965), cert. denied, 384 U. S. 947, 86 S. Ct. 1467, 16 L. Ed. 2d 544 (1966); *United States v. Agueci,* 310 F. 2d 817, 833-834 (2d Cir. 1962), cert. denied [*Guippone v. United States*], 372 U. S. 959, 83 S. Ct. 1013, 10 L. Ed. 2d 11 (1963). Indeed, voter registration lists are made the primary source of jurors in the new Jury Selection and Service Act of 1968, 28 U. S. C. A. 1861-1871 (Supp. July, 1968)."

And as discussed in *United States v. Kroncke* (1970), 321 F. Supp. 913, relative to the constitutionality of the federal jury selection scheme:

" * * * Jury duty is regarded both as a duty and as a privilege, and to be eligible therefore one must be a registered or actual voter. Those who wish to disassociate themselves from the political process by not voting forfeit the right to be selected on either a grand or petit jury. Congressional policy as expressed in Jury Service and Selection Act of 1968 aforesaid establishes the voting lists as the primary source of jurors, with special provisions

for the District of Columbia, where citizens then had no vote, and certain other districts such as Puerto Rico and the Canal Zone. Congress may well have been motivated by the practicalities of the situation and the frailties of any other method such as the use of telephone directories, tending only to reach home owners and far more frequently only the husband in whose name the listing is maintained, or privately published city directories which are not always updated nor completely accurate. A number of decisions have passed on the question and have held jury selection from voter lists to be constitutional. *Gorin* v. *United States,* 313 F. 2d 641 (1st Cir. 1963); *Rabinowitz* v. *United States,* 366 F. 2d 34 (5th Cir. 1966); *United States* v. *Caci,* 401 F. 2d 664 (2d Cir. 1968); *Camp* v. *United States,* 413 F. 2d 419 (5th Cir. 1969)."

It becomes evident from an examination of the cases on this subject that under the United States Constitution a defendant is not necessarily entitled to a 100 percent absolutely perfect cross-selection of citizens for the jury panel, but only to panels selected by the best method that thoughtful men in and out of the General Assembly, who have studied the practicalities of selection and who are cognizant of the inherent problems involved, have been able to develop.

Looking at the requirements in this state to become a qualified elector at the time of defendant's trial, one needed only be 21 years of age and satisfy certain residency requirements. It has been the universal rule that a state statute may restrict eligibility for jury service in a county to adult citizens, and typical statutory provisions as to the qualifications of jurors are that one must be a citizen of the United States and a resident of the county, not less than 21 years of age,[1] or more than a certain age—such as 65 or 70. 47 American Jurisprudence 2d 710, Jury, Section 100; See, also, 50 Corpus Juris Secundum 871, Juries, Sec-

---

[1] See *Britton* v. *Bullen* (1967), 275 F. Supp. 756, where a Maryland requirement that a juror be at least 25 years of age was held not to be unreasonable.

tion 149. Thus, the underlying requirements to become a qualified elector eligible for jury selection in Ohio are not themselves unusual or unreasonable.

See, also, *Moorer* v. *State* (1964), 244 S. C. 102, 135 S. E. 2d 713, certiorari denied, 379 U. S. 860; *Wheeler* v. *State* (1953), 219 Miss. 129, 63 So. 2d 517, certiorari denied, 346 U. S. 852, wherein state provisions that no person shall be a juror unless a qualified *elector* were held not to contravene the Constitution of the United States.

2. Does the restriction of venireman to registered electors unduly restrict the class of prospective jurors to such an extent that the defendant is deprived of the opportunity of obtaining jurors who could render a fair and impartial verdict?

We believe that this system of selection represents a reasonable classification for the selection of jurors, from whom the defendant would be as likely to receive a fair and impartial verdict as he would from a jury composed of both registered and non-registered electors.

The right to trial by an impartial jury means that prospective jurors must be selected by officials without the systematic and intentional exclusion of any cognizable group. However it is not necessary that every jury contain representatives of all economic, social, religious, racial, political and geographical groups of the community. *Thiel* v. *Southern Pacific Co.* (1946), 328 U. S. 217. Each of those groups are adequately represented within the ranks of the registered electors of this state, and a jury selection system envisaging only registered voters does not systematically, nor intentionally, exclude any one particular group of the above. As stated by the United States Supreme Court in *Brown* v. *Allen, supra* (344 U. S. 443), at 474: "Our duty to protect the federal constitutional rights of all does not mean we must or should impose on states our conception of the proper source of jury lists, so long as the source reasonably reflects a cross-section of the population." (Quoted with approval in *Carter* v. *Greene County, supra* [396 U. S. 320], at 332.)

## IV.

Defendant next contends that his motion for a change of venue was peremptorily overruled by the trial court, without objection by the prosecution to the motion or submission by the prosecution of any evidence against the motion, thereby denying him due process of law. Defendant's counsel offered the only evidence on the issue of change of venue. It is his contention that until the prosecutor refuted that evidence the defendant's evidence, alone, stood before the trial court, and so constituted a *prima facie* case for change of venue. Such is not the rule in Ohio.

The power of a court to order a change of venue is not of common law origin, but is solely statutory. *State* v. *McGehan* (1875), 27 Ohio St. 280. R. C. 2931.29 provides that "if it *appears to the Court* of Common Pleas, by affidavit or evidence in open court, that a fair and impartial trial cannot be had in the county where a cause is pending such court shall order the accused tried in another county." (Emphasis supplied.) The action of the trial judge on the motion for a change of venue is final, in the absence of an abuse of discretion. See *Richards* v. *State* (1932), 43 Ohio App. 212. In ruling on the motion the judge may consider all evidence before him, and if the party against whom the change of venue is sought (here, the prosecution) fails to introduce evidence, such failure, if prejudicial at all, is only prejudicial to the party opposing the change of venue.

At the time of the motion, the court considered the evidence presented by the defendant in support of the motion, which included a newspaper article entitled "Sergeant Identifies Leigh As Triggerman." The court then asked the prosecutor for any comments on the motion and he replied that he had none. The court, having heard the evidence presented before it on this issue, then overruled the motion.

A change of venue should not be granted solely on the affidavit of one party alone, but only upon clear and satis-

factory proof that fair and impartial justice probably cannot be obtained in the county in which the suit was commenced. *Bank of Cleveland* v. *Ward* (1841), 11 Ohio 128. However, the fact of bias or prejudice, or danger of an unfair trial, as set forth in an affidavit or motion to transfer a cause is not an issuable one to be tried (See *State, ex rel. Zurhorst,* v. *Wolfe* [1895], 11 C. C. 591), but rather is one directed to the discretion of the trial judge, and no joinder of issues is necessary to test the sufficiency of the motion. In assessing whether a fair and impartial trial can be obtained in the county where the trial has been instituted, the judge may take judicial notice of the general demeanor and prejudice of the community, of the effectiveness of procedural safeguards employed at trial—such as sequestration of the jury and the holding of simultaneous trials—and the prospect of obtaining jurors who are fair, impartial, and not prejudiced. With regard to the last, this court has said that an examination of the jurors on their *voir dire* affords the best test as to whether prejudice exists within the community against the defendant, and where it appears that opinions as to the guilt of the defendant by those called for examination as prospective jurors are not fixed but would yield readily to evidence, it is not error to overrule an application for a change of venue. *State* v. *Swiger* (1966), 5 Ohio St. 2d 151. In the present case, each juror seated stated that he had no opinion at the time of his being selected as to the guilt or innocence of the defendant and that he would base his verdict on the evidence and the law as heard by them at trial. See, also, *Beck* v. *Washington* (1961), 369 U. S. 541, where the Supreme Court held that there was no constitutional infirmity in a state trial court's adverse rulings on an accused's motions for a change of venue and for continuances on the ground of adverse publicity preventing the selection of a fair petit jury, where the accused actually received a trial by an impartial jury.

## V.

Appellant argues that the trial court's instruction to the jury on the issue of insanity was erroneous, in that it

imposed a burden on the defendant to prove the affirmative defense of "not guilty by reason of insanity" by a preponderance of the evidence.

The court charged the jury on the issue of insanity as follows: "The plea of not guilty by reason of insanity raises the issue of the insanity of the defendant at the time of the alleged commission of the crime. In order to establish the defense of insanity, the accused must establish by a preponderance of the evidence that a disease or other defect of his mind had so impaired his reason that at the time of the criminal act with which he is charged either he did not know that such act was wrong or he did not have the ability to refrain from doing that act." Defendant's counsel took exception to the charge.

In Ohio, the defendant in a criminal case is presumed at law to be sane, and the burden of proof rests upon the defendant to prove, by a *preponderance of the evidence*, that he was insane within the meaning of the law at the time the act was committed. *Clark* v. *State* (1843), 12 Ohio 483, 494; *Loeffner* v. *State* (1858), 10 Ohio St. 598; *Bergin* v. *State* (1877), 31 Ohio St. 111; *Kelch* v. *State* (1896), 55 Ohio St. 146; *State* v. *Austin* (1905), 71 Ohio St. 317. See, also, *Silvus* v. *State* (1871), 22 Ohio St. 90. The appellant contends that this rule of law is not consistent with two other well established rules of law in Ohio codified in R. C. 2945.04, namely: (1) Defendant is presumed innocent until proven guilty of the crime charged, and (2) this presumption of innocence places upon the state the burden of proving every essential element of the crime beyond a *reasonable doubt.*

R. C. 2943.03 provides, in part:

"* * * A defendant who does not plead not guilty by reason of insanity is conclusively presumed to have been sane at the time of the commission of the offense charged." However, where the defendant does plead "not guilty by reason of insanity" the presumption of sanity still exists but is a rebuttable one.

Defendant contends that a defendant who pleads not guilty by reason of insanity should not have any greater

burden of proof put upon him than the defendant who pleads simply not guilty. While we agree that in some instances the degree of proof required of one who pleads "not guilty by reason of insanity" is higher than that of one who simply pleads not guilty, due to the policy of the law which, of necessity, presumes one sane until proved otherwise by a preponderance of the evidence, defendant had the option of putting the prosecution to the full burden of proving all the elements of the crime charged *beyond a reasonable doubt* by pleading "not guilty," in addition to "not guilty by reason of insanity." This the defendant did, and accordingly exercised his prerogative to put the prosecution to the test of establishing all elements of the crime beyond a reasonable doubt.

In such an instance, the fact that the defendant is not found "not guilty by reason of insanity" obviously does not, in and of itself, require a finding of guilty to the crime charged, and the state must still meet the standards of proof required by R. C. 2945.04, *supra*, to establish its case in chief. R. C. 2945.04 relates to the degree and burden of proof required to be adduced by the state, and does not by its terms contemplate the degree and burden of proof relative to the affirmative defense of insanity—which defense by its very nature may operate independently of the state's case in chief—and may in certain instances be available to the defense even if the prosecution sustains its burden of establishing every substantial element of the crime charged beyond a reasonable doubt. Thus, in the present case, where the defendant is charged with violation of R. C. 2901.01 (the killing of another while perpetrating or attempting to perpetrate robbery), the affirmative defense of insanity is available even if the state does prove the requisite elements of that crime beyond a reasonable doubt.

In *Kelch* v. *State, supra* (55 Ohio St. 146), at page 147 the court discussed the history and policy of this state relative to the burden and quantum of proof required of a defendant asserting the defense of insanity and the relevant factors involved:

"The question of the burden of proof, where insanity is set up as a defense in criminal causes, has been fruitful of discussion, and has occupied the attention of the ablest criminal jurists of this country, and of England. The contention has not so much concerned the degree of proof, as upon whom the burden rested. Some authorities, entitled to a great consideration have steadily held that this burden rested upon the state; that while the presumption of sanity was sufficient to support this burden where the evidence did not suggest mental alienation, yet if the defense was made, the state was bound to establish sanity beyond a reasonable doubt. This view was founded upon the obligation which rests upon the state to establish beyond a reasonable doubt every fact necessary to create in the defendant criminal liability; criminal intent being one of such facts, it was included within the general obligation above stated, and to establish this criminal intent, a mental condition capable of entertaining it must be established. This course of reasoning would render immaterial the question whether the doubt of sanity arose upon the evidence of state, or of the defendant, or upon that of both the state and the defendant. The doubt, however arising, being available by the defendant. * * *

"The logical consistency of this view of the question is its chief support. In the practical administration of criminal law, however, experience has found much to commend in that opposite view which treats the defense of insanity as independent and affirmative, and which, consequently, casts upon the accused who asserts it the burden of sustaining it by evidence sufficient to overcome the natural presumption of sanity. * * *

"This being the established doctrine of this state, the burden of proving his insanity rested on the plaintiff in error. If this burden should be sustained, the law exonerates him from criminal responsibility for his act.

"In most of the cases relating to the burden of proof of insanity in criminal causes, the contention was confined to the question of where it rested—whether on the state or on the defendant—and the quantum or degree of proof

where made to rest on defendant, received little, if any, consideration, either by counsel or the court; and language was sometimes employed by the court which seemed to require of the defendant, to establish his insanity, more than a preponderance of the evidence.

"In some of the cases, however, the question of the quantum of proof where the burden was placed on the accused, came directly before the court. * * *

"* * *

"In *Bond* v. *The State*, 23 Ohio St., 349, it is held 'the burden of proof to establish the defense of insanity in a criminal case rests upon the defendant, but a bare preponderance of testimony is all that is necessary for that purpose.' This rule is reasserted in *Bergin* v. *The State*, 31 Ohio St., 111, a case like the one under consideration, of murder in the first degree; *Loeffner* v. *The State*, 10 Ohio St., 598. Self defense in Ohio, as well as insanity, is regarded as affirmative defense. In *Silvus* v. *The State*, 22 Ohio St., 90, and *Weaver* v. *The State*, 24 Ohio St., 584, both cases where self-defense was relied upon by the accused for justification, this court held that the defense should be shown by preponderating evidence. These cases relating to the burden and *quantum* of evidence required to establish a plea of self defense, are of course only material as tending to show the steadiness with which this court has held to the rule that a preponderance of the evidence is sufficient to sustain an affirmative defense in a criminal cause."

In *Silvus, supra* (22 Ohio St. 90, 101), the court observed:

"* * * The materiality of the fact of insanity upon the issue is to rebut the criminal intent of the injurious act, which is presumed to exist from sanity. In regard to this defense, the rule is that the burden is on the defendant to establish it by a preponderance of evidence. *Clark* v. *State*, 12 Ohio, 494; *Loeffner* v. *State*, 10 Ohio St. 599; *Commonwealth* v. *Eddy*, 7 Gray, 583.

"The principle of these decisions is, that, in judicial investigation, facts legally presumed are, until rebutted,

as effectual as facts proved. And where a party claims to control the legal effect of facts by the alleged existence of other facts, the burden is on him to show a preponderance of evidence in favor of the existence of the latter. Facts which are neither proved, nor to be presumed, are, for judicial purposes, regarded as not existing.''

## VI.

The defendant's next proposition of law, that the prosecutor was guilty of misconduct when he allegedly misled the court and jury by offering in evidence the bank signature card which allegedly bore defendant's signature, thereby placing defendant at the scene of the crime, when in fact the prosecutor knew that the signature was a forgery, is without merit. During the course of the trial, the state offered in evidence an account card which bore the name ''Watterson Johnson,'' and introduced defendant's own confession wherein Johnson admitted that sometime prior to the robbery-murder he and Kassow had gone to the Savings and Loan, where Kassow had filled out an account card, using Johnson's name. At the time the exhibit was offered to the court, the signature card was not used for the purpose of establishing that the signature was actually that of Johnson, but rather to corroborate defendant's own confession. It is apparent, in light of the other evidence presented by the prosecution, that the card was not introduced to mislead the jury to believe that the signature was that of the defendant.

## VII.

The next alleged prejudicial error occurred during the selection in seating the jurors. In the presence of nine prospective jurors who eventually wound up in the jury panel that convicted the defendant, the following took place during the *voir dire* of a prospective juror, Thomas Edward Galvin, by defense counsel:

''Q. * * * You have had no jury duty before?

''A. Never.

''Q. I don't suppose then that you understand just what an indictment is, do you?

''A. Yes, I understand.

"Q. Well, all right. What is an indictment?

"A. An indictment is an accusation against someone who has probably broken the law.

"Q. Well, now, I'm glad you gave that definition because that definition is—

"The Court: I think he must have gone to law school, Mr. Hopkins. That's a pretty accurate definition.

"Mr. Hopkins: Well, I'd have to give him a zero on that explanation because he used one word, 'that has probably broken the law.'

" * * *

"The Court: I'd say that I would give him an A. Go ahead.

"Mr. Hopkins: Well, I have to differ with you because I'm sure that you don't want to convey to this jury that because an indictment is returned our client's probably broken the law. That's not the law.

" * * *

"Mr. Hopkins: I'll take exception to his Honor's statement."

Three days after this error on the part of the judge, the court attempted to correct the idea that the defendant had probably broken the law simply because an indictment had been returned against him. In that correction, the judge specifically admonished the impaneled jury that an indictment "* * * has absolutely nothing to do with guilt. * * * An indictment is merely a means provided by law for bringing the charge, that is, for accusing the defendant of the offense * * * the indictment itself is absolutely no evidence, it is not evidence, and it's absolutely no indication of guilt and should not be considered by you as such in the event you're selected to serve on this jury."

Upon review of the entire record we find that this specific admonishment to the jury, to not consider the erroneous comments, was sufficiently curative so as to dispel any prejudicial effect created.

## VIII.

The trial court did not err, as alleged by defendant, when it refused to inquire into the defendant's present

sanity when a last minute motion, not in conformance with the mandate of R. C. 2945.37 (requiring the accompaniment of a certificate of a reputable physician), was filed by defense counsel suggesting present insanity on the first day of the trial. Counsel had adequate time to file such certification before the trial, based upon a reasonable opportunity to observe the conduct of the defendant. Furthermore, there is nothing in the record to suggest that defendant was not sane and not able to stand trial, and accordingly there was no evidence presented pursuant to R. C. 2945.37 (pertaining to judicial inquiry into the insanity of a criminal defendant) which would show that the trial judge abused his discretion by failing to notice that the defendant was not then sane nor entitled to an examination into the question of sanity or insanity.[2]

It is our conclusion that, except as to the death sentence, the judgment of the Court of Appeals is affirmed. With regard to the death sentence, the judgment of the Court of Appeals must be modified and the sentence is reduced to life imprisonment, as prescribed in R. C. 2901.01.

*Judgment accordingly.*

O'NEILL, C. J., SCHNEIDER, HERBERT, STERN and LEACH, JJ., concur.

CORRIGAN, J., concurs in paragraph two, three and four of the syllabus and in the judgment.

---

[2]R. C. 2945.37 provides:

"If the attorney for a person accused of a crime whose cause is pending in the Court of Common Pleas, before or after trial suggests to the court that such person is not then sane, and a certificate of a reputable physician to that effect is presented to the court, or if the grand jury represents to the court that any such person is not then sane or if it otherwise comes to the notice of the court that such person is not then sane, the court shall proceed to examine into the question of the sanity or insanity of said person, or in its discretion may impanel a jury for such purpose. If three fourths of such jury agree upon a verdict, such verdict may be returned as the verdict of the jury. If there is a jury trial and three fourths of the jury do not agree, another jury may be impaneled to try such question."