The STATE of Ohio, Appellee,

v.

SPITLER, Appellant.

[Cite as *State v. Spitler* (1991), 75 Ohio App.3d 341.]

Court of Appeals of Ohio,
Franklin County.

No. 90AP–1390.

Decided Oct. 3, 1991.

342

*Michael Miller*, Prosecuting Attorney, *Alan C. Travis* and *Bonnie L. Maxton*, for appellee.

*Vivyan, Graeff & Schumacher* and *David J. Graeff*, for appellant.

STRAUSBAUGH, Judge.

This is an appeal by defendant from a judgment of the Franklin County Court of Common Pleas entering judgment on a jury's verdict which found defendant guilty of two counts of aggravated murder, one count of aggravated robbery, and one count of aggravated burglary. Since there were accompanying possible death penalty specifications, the jury, following a mitigation hearing recommended life with defendant's first hearing to be at thirty years, and the trial court sentenced according to that recommendation.

On January 28, 1990, Columbus police discovered the body of Norman Brofford in a stairwell at Dennison Avenue Medical Center ("Center"). A trail of blood began in the kitchen next to the entrance to the stairwell where police found a bullet lodged in a cabinet. Police found another bullet in the wall behind the victim's head approximately two feet above the stair landing. Police also discovered that a locked door to Dr. Arnold Allenius' private office on the third floor of the clinic had been forced open but that there existed no evidence of burglary in any other areas of the clinic.

Testimony at trial included that of Charles "Ghetti" McDonald, who was employed as a janitor at the Center in January 1990. McDonald asked defendant, Daniel Lee Spitler, if he would be interested in helping him clean the medical building. Apparently, McDonald had on other occasions invited other persons into the Center. Defendant accepted McDonald's offer and ultimately entered Allenius' office discovering more than $13,000 inside a file cabinet. McDonald testified that defendant stated that it was "God's will" that they steal the money and that defendant then became obsessed with taking the money. McDonald told several other persons about the money who advised McDonald to tell defendant the money was gone the next day, which McDonald did. Subsequently, defendant learned that the money was not in fact missing.

The Friday evening before the homicide, defendant told McDonald that he had met Brofford and the security guard at the Center earlier in the evening. The security guard George Taylor confirmed that he had found defendant wandering around the building before closing and asked him what he was doing there. Taylor testified that defendant told him that he was looking for George and Peg and that he was supposed to meet them there. Taylor stated that he thought it was unusual that defendant would meet George Stow and Margaret "Peg" Townsend at the Center since they were the owners of the cleaning business that operated in the Center and seldom came to the clinic. Upon defendant's request, Taylor escorted defendant to the third floor to look for George and Peg. After not finding them, defendant then asked if Brofford was there and Taylor then escorted defendant to Brofford's apartment at the south end of the building. Defendant and Brofford then spoke to one another and when through, defendant left the building. Stow and Townsend later testified that they did not know defendant and were never scheduled to meet him at the clinic.

Mark Lowery testified that defendant had no money to get an apartment, so he was temporarily living with Lowery until he could find a job. Lowery further testified that prior to the homicide, defendant had $140 in the bank and a delinquent J.C. Penney bill. On the day of defendant's arrest, defen-

dant called Lowery from the jail and asked Lowery to deliver his briefcase to his attorney. Defendant told Lowery that there was a small amount of money in the briefcase. When police executed a search warrant at Lowery's house, a large sum of money was discovered.

Jill Bloom, an operating room technician, was walking her dogs after the Super Bowl telecast, which the parties stipulated ended at 8:27 p.m., when she heard a loud noise and saw a man run from the south entrance of the clinic. The man did not check to see if the door locked behind him and ran across the parking lot between the buildings. Bloom testified that there was adequate light to see that the man had black hair, fair skin, a beard, a shag haircut, and was of average height. This physical description matched that of the defendant. Bloom later picked defendant's photo from a photo array. Bloom was positive that the man running was not McDonald and stated she was even more sure of her in-court identification that defendant was the man she had seen than she had been at her photo-array identification.

Dennis Van Pelt, the sales manager at Motorland, U.S.A., testified that shortly after the homicide defendant bought an automobile and paid $2,130 cash in large denominations which he took out of a briefcase. Donna Weaver, a co-owner of Weaver's Cycle Sales, testified that three months prior to the homicide, defendant put a new motorcycle on layaway since he was denied financing. After paying $200, defendant still owed approximately $1600 on the motorcycle. At some later point, defendant requested that the $200 be returned so that he could buy his car which was going to be auctioned off at a police auction in Columbus. Weaver refused to give defendant a refund and heard no more from him until he paid the remaining balance in cash the day after the homicide. Defendant used sixteen $100 bills and one $50 bill which he pulled from his briefcase. Weaver testified that defendant told her that he wanted to get the motorcycle as soon as possible because he wanted to leave Columbus. Weaver also testified that defendant was saying something about a night watchman that had been murdered at a medical building and that he could have committed the murder because he had been there a few minutes earlier.

During a taped conversation with McDonald, defendant admitted that he was inside Allenius' office and that he had handled the money and wiped his fingerprints off of anything that he had touched and that neither he nor McDonald had anything to worry about. Defendant further stated that his alibi was being at Herby's Bar and Tradewinds bar between 8:00 and 11:00 p.m. and that numerous people had seen him there. Herby's Bar is seven-tenths of a mile from the homicide scene and about a two- to three-and-a-half-minute drive. Byron Adams, a defense witness, testified that when he had

met defendant a few months before the homicide, he lacked the money to pay for a $3.54 meal, but that on the night of the homicide, defendant not only repaid the debt to Adams, but did the unusual act of buying Adams' group of friends beer.

Defendant also testified at trial and stated that just prior to the homicide he was in bad financial shape, having just closed out his $140 bank account. Defendant also stated that he owed on an account to J.C. Penney for over a year and although it was delinquent prior to the homicide, within a few days after the homicide, he paid the account in full in cash. In explaining where the large amounts of cash had come from, defendant testified that he had received an anonymous phone call setting up a meeting with a man unknown to defendant who asked him several questions. Defendant testified that following their conversation, this unknown individual handed defendant two envelopes filled with $18,000 in cash and suggested that defendant leave Columbus.

On appeal, defendant has set forth four assignments of error for this court's review:

"1. Where testimony shows at a pre-trial motion to suppress evidence from a search warrant that the officer who signed the supporting affidavit withheld significant information from the magistrate which would have clearly demonstrated a lack of probable cause, the resultant evidence must be suppressed since seizure occurred contra the Fourth and Fourteenth Amendments to the United States Constitution and the Ohio Constitution.

"2. A trial court commits prejudicial error in overruling the pre-trial motions to reduce bias on the jury list and the motion to inform the court the reasons for exercising peremptory jury challenges, when the evidence shows that the accused was an active member of the gay community, a recognized, distinctive group, and the petit jury which convicted him was not a fair cross-section of the community contra the Sixth Amendment and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

"3. (A) When a trial court sustains a pre-trial motion to divulge all exculpatory evidence, and the prosecution withholds testimony of a witness crucial to the outcome, the result is prejudicial to the accused, contra his Sixth Amendment right to a fair trial and the Due Process Clause of the Fourteenth Amendment.

"(B) The verdict was against the manifest weight of the evidence.

"4. The accused is denied his Sixth Amendment right to counsel when the police order a witness to record statements of the accused at the inception of the adversarial process."

In his first assignment of error, defendant argues that the trial court erred in allowing the admission at trial of certain evidence discovered after a search warrant was executed at defendant's residence. Defendant argues that the affidavit attached to the search warrant was insufficient to establish probable cause and further that the affiant police officer deliberately misled the magistrate by both misstatement and omission.

At the outset, we note that defendant's argument is premised upon the Fourth Amendment to the United States Constitution, which provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

Accordingly, in order for a search warrant to be properly issued there must exist probable cause which is supported by oath or affirmation.

In *State v. George* (1989), 45 Ohio St.3d 325, 544 N.E.2d 640, the Supreme Court of Ohio in paragraphs one and two of its syllabus adopts the United States Supreme Court's standard for reviewing the sufficiency of search warrants:

"1. In determining the sufficiency of probable cause in an affidavit submitted in support of a search warrant, '[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.' (*Illinois v. Gates* [1983], 462 U.S. 213, 238–239 [103 S.Ct. 2317, 2332, 76 L.Ed.2d 527, 548], followed.)

"2. In reviewing the sufficiency of probable cause in an affidavit submitted in support of a search warrant issued by a magistrate, neither a trial court nor an appellate court should substitute its judgment for that of the magistrate by conducting a *de novo* determination as to whether the affidavit contains sufficient probable cause upon which that court would issue the search warrant. Rather, the duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed. In conducting any after-the-fact scrutiny of an affidavit submitted in support of a search warrant, trial and appellate courts should accord great deference to the magistrate's determination of probable cause, and doubtful or marginal cases in this area should be resolved in favor of upholding the warrant. (*Illinois v. Gates* [1983], 462 U.S. 213 [103 S.Ct. 2317, 76 L.Ed.2d 527], followed.)"

We note that the supporting affidavit and the search warrant which was issued are not in the record on appeal before this court and apparently were neither read into the record or admitted as evidence before the trial court. Although marked as state's Exhibit 2 at the suppression hearing, the parties did not move .to admit them. The only evidence of what the affidavit and search warrant provided is evidenced by the testimony of the affiant, Detective Robert W. Young, Jr., at the suppression hearing. Detective Young testified that the police were looking for evidence which arose out of the crime of aggravated murder at the Center on January 28, 1990. Specifically, Detective Young stated that the police were looking for a .38–caliber revolver and more than $12,000 in currency. Young stated that McDonald informed him during several interviews that defendant had trespassed into a private office at the Center and had seen a large amount of money and a gun. Young further testified that while McDonald informed him that he had told several other people about defendant's having seen the money, he did not execute warrants on those persons' homes since Young discovered that prior to the drafting of the search warrant Bloom had seen a man who matched defendant's description run from the building at approximately the same time of the murder. Furthermore, Bloom had picked defendant's picture out of a photo array. Following the hearing on defendant's motion to suppress, the trial court took the matter under advisement and permitted the parties to brief the issue. Several days later, the trial court overruled defendant's motion to suppress.

■ Based upon a review of the transcript of the hearing, as well as the arguments presented both before the trial court and this court, we cannot conclude that the trial court erred in overruling defendant's motion to suppress. Moreover, even if this court found that the affidavit was insufficient to establish probable cause, the trial court properly found that the seized evidence was nevertheless admissible. In paragraph three of its syllabus in *George, supra,* the court held:

"The Fourth Amendment exclusionary rule should not be applied so as to bar the use in the prosecution's case-in-chief of evidence obtained by officers acting in objectively reasonable reliance on a search warrant issued by a detached and neutral magistrate but ultimately found to be unsupported by probable cause. (*United States v. Leon* [1984], 468 U.S. 897 [104 S.Ct. 3405, 82 L.Ed.2d 677], followed.)"

We are unable to conclude that defendant has demonstrated that Young was guilty of misconduct or that he recklessly misled the magistrate who issued the search warrant at issue in the present case. See *Franks v. Delaware* (1978), 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667. Accordingly, as

we find no error by the trial court in overruling defendant's motion to suppress, we conclude that defendant's first assignment of error is not well taken and is overruled.

In his second assignment of error, defendant insists that the jury which convicted him was not a fair cross-section of the community in violation of the Sixth Amendment and the Equal Protection Clause of the Fourteenth Amendment. Specifically, defendant argues that since it was undisputed that he and several of his associates were members of the gay community, reversal is warranted since there was a systematic exclusion of this group in the jury selection process. Defendant maintains that his constitutional rights were violated when the trial court overruled his motion to reduce bias in the annual jury lists as well as his motion which requested that the trial court order the state to give its reasons for exercising peremptory challenges.

In first addressing defendant's argument regarding the trial court's having overruled his motion to reduce bias in the annual jury lists, we note the applicable standard to be applied as set forth by the Supreme Court of Ohio in paragraph two of its syllabus in *State v. Fulton* (1991), 57 Ohio St.3d 120, 566 N.E.2d 1195, in which the court held:

"In order to establish a violation of the fair representative cross-section of the community requirement for a petit jury array under the Sixth and Fourteenth Amendments to the United States Constitution, a defendant must prove: (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that the representation is due to systematic exclusion of the group in the jury-selection process. (*Duren v. Missouri* [1979], 439 U.S. 357, 364 [99 S.Ct. 664, 668, 58 L.Ed.2d 579, 587], applied and followed.)"

In *Holland v. Illinois* (1990), 493 U.S. 474, 110 S.Ct. 803, 107 L.Ed.2d 905, the Supreme Court discussed the Sixth Amendment's fair-cross-section requirement:

"The Sixth Amendment requirement of a fair cross section on the venire is a means of assuring, not a *representative* jury (which the Constitution does not demand), but an *impartial* one (which it does). Without that requirement, the State could draw up jury lists in such manner as to produce a pool of prospective jurors disproportionately ill disposed towards one or all classes of defendants, and thus more likely to yield petit juries with similar disposition. The State would have, in effect, unlimited peremptory challenges to compose the pool in its favor. The fair-cross-section venire requirement assures, in other words, that in the process of selecting the petit jury the prosecution and

defense will compete on an equal basis." (Emphasis *sic.*) *Id.* at 480–481, 110 S.Ct. at 807, 107 L.Ed.2d at 916–917.

In Franklin County, annual jury lists are drawn solely from the pool of registered voters, a system which the Supreme Court has determined comports with due process. See *State v. Johnson* (1972), 31 Ohio St.2d 106, 60 O.O.2d 85, 285 N.E.2d 751. Defendant has failed to demonstrate that members of the gay community were systematically excluded from the venire pool. The only record with regard to voir dire relates to the number of black veniremen struck during the jury selection process which is also insufficient to show systematic exclusion even of blacks since the only black veniremen excused were excused by defendant. See *Batson v. Kentucky* (1986), 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69. Although defendant requested that the trial court supplement the annual jury list with the names of licensed drivers, there existed no showing that this would have corrected the bias defendant alleged exists in the jury selection process. We cannot therefore conclude that the trial court erred in overruling defendant's motion with regard to a reduction of bias in the annual jury lists since defendant has failed in his burden to demonstrate a systematic disproportion between the list of registered voters and members of the gay community.

■ Although defendant also argues that the trial court erred in refusing to order the state to explain its rationale when it exercised its peremptory challenges, we cannot conclude that reversal is warranted on this basis. As noted by the state in its appellate brief, the Supreme Court has rejected defendant's argument that the trial court's refusal to require the state to explain the basis for the exercise of peremptory challenges now precludes defendant from being able to demonstrate that the state acted discriminatorily. In *Holland, supra,* the court noted the inapplicability of the Sixth Amendment fair-cross-section analysis to petit jury composition:

"But to say that the Sixth Amendment deprives the State of the ability to 'stack the deck' in its favor is not to say that each side may not, once a fair hand is dealt, use peremptory challenges to eliminate prospective jurors belonging to groups it believes would unduly favor the other side. Any theory of the Sixth Amendment leading to that result is implausible. The tradition of peremptory challenges for both the prosecution and the accused was already venerable at the time of Blackstone, * * * was reflected in a federal statute enacted by the same Congress that proposed the Bill of Rights, * * * was recognized in an opinion by Justice Story to be part of the common law of the United States, * * * and has endured through two centuries in all the States * * *. * * * In *Lockhart [v. McCree* (1986), 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137], we said: 'We have never invoked the fair-cross-section

principle to invalidate the use of either for-cause or peremptory challenges to prospective jurors, or to require petit juries, as opposed to jury panels or venires, to reflect the composition of the community at large.' 476 U.S., at 173 [106 S.Ct. at 1765, 90 L.Ed.2d at 147]. In *Taylor [v. Louisiana* (1975), 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690], we 'emphasized that in holding that petit juries must be drawn from a source fairly representative of the community we impose no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population. Defendants are not entitled to a jury of any particular composition.' 419 U.S., at 538 [95 S.Ct., at 702, 42 L.Ed.2d at 702–703]." (Citations omitted.) *Id.*, 493 U.S. at 481–483, 110 S.Ct. at 807–809, 107 L.Ed.2d at 917–918.

While the Sixth Amendment analysis is not applicable relative to defendant's argument that the prosecutor's use of peremptory challenges was inappropriate, the state's ability to use peremptory challenges to strike individual jurors is nevertheless subject to the limitations imposed by the Equal Protection Clause. See *Batson, supra.* In the present case, neither party has cited a case holding that gay persons are a cognizable group for purposes of equal-protection analysis. Although defendant directs this court's attention to the Supreme Court's decision in *Fulton, supra,* wherein the court recognized the Old Order Amish religious faith as a distinctive group for purposes of the Sixth Amendment, the court did so after evidence was introduced at a hearing finding that members of the Old Order Amish religious faith account for approximately thirty-five percent of the population of Holmes County and that they have a separate and distinct mode of living. The record in the present case contains no such information about the gay population of Franklin County. Accordingly, we must conclude that defendant's second assignment of error is not well taken and it is therefore overruled.

Defendant next argues in his third assignment of error that he was denied a fair trial on the basis that the prosecutor failed to divulge a statement that was exculpatory. Defendant argues that in this case the error is even more egregious given the fact that the trial court had already sustained a defense pretrial motion to divulge all exculpatory evidence. Defense witness Robert McCallum stated on direct examination that he had seen defendant at Herby's Bar twice on the night of the homicide: once, between 7:00 and 7:30 p.m., and again between 8:30 and 9:00 p.m. On cross-examination, the prosecutor used a previous statement made by McCallum in an effort to impeach his direct testimony. Specifically, McCallum told police on February 2, 1990, that he had first seen defendant between 8:30 and 9:00 on the evening of the murder. Defendant maintains that this statement

impeaches the credibility of a crucial witness to the defense and is therefore prejudicial given the fact that the prosecutor had been previously ordered to divulge all exculpatory evidence.

The state is required to disclose evidence which is known and is favorable to the defendant when such evidence is material to either guilt or punishment. *Brady v. Maryland* (1963), 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215. Moreover, where there exists an order of the trial court requiring that the prosecution turn over exculpatory material, the failure by the prosecution to comply with such an order should be carefully reviewed by the trial court so as to eliminate prosecutorial misconduct. The trial court in the present case reviewed all three summaries of statements given on February 2, 1990, by patrons of Herby's Bar regarding what times, if any, they had seen defendant in the bar on the night of the homicide. The trial court then concluded that there existed nothing that would be of an exculpatory nature. Following a review of the testimony given at trial, we believe that defendant should have been provided with McCallum's statement of February 2, 1990. However, we are unable to conclude that there exists prejudicial error in the present case. The Supreme Court has held that where exculpatory information is revealed during trial as opposed to after trial, the due process principles announced by the court in *Brady, supra,* are not violated. *State v. Wickline* (1990), 50 Ohio St.3d 114, 116, 552 N.E.2d 913, 916–917. Moreover, although there appears to be a discrepancy between the two statements, we cannot conclude that they were so material as to prejudice the fairness of defendant's trial.

The defendant also includes in his third assignment of error a contention that the verdict was against the manifest weight of the evidence. Although defendant directs no specific argument to this fact but instead dedicates his entire discussion to his exculpatory-evidence argument, following our review of the record in the present case as demonstrated by the facts previously set forth, we are unable to conclude that the verdict was indeed against the manifest weight of the evidence. In so holding, we are cognizant of the Supreme Court's mandate in *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, in which the court held in its syllabus:

"1. On the trial of a case, either civil or criminal, the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts.

"2. A reviewing court may not reverse a judgment of conviction in a criminal case in a trial court, where the record shows that a verdict of guilty was returned by a jury on sufficient evidence and where no prejudicial error

occurred in the actual trial of the case or in the instructions given the jury by the court."

Accordingly, defendant's third assignment of error is not well taken and is overruled.

Finally, in his fourth assignment of error, defendant maintains that he was denied his Sixth Amendment right to counsel when police ordered McDonald to secretly tape conversations with defendant during the homicide investigation. However, these taped conversations occurred prior to the point when defendant was either arrested or formally charged. Defendant had no right to counsel under the Fifth Amendment because defendant was not in custody. See *Arizona v. Roberson* (1988), 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704; *State v. Wiles* (1991), 59 Ohio St.3d 71, 83, 571 N.E.2d 97, 114. Furthermore, defendant had no right to counsel under the Sixth Amendment because he had not been formally charged or indicted. See *Patterson v. Illinois* (1988), 487 U.S. 285, 108 S.Ct. 2389, 101 L.Ed.2d 261; *United States v. Wade* (1967), 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149; *State v. Stricklen* (1980), 63 Ohio St.2d 47, 17 O.O.3d 29, 406 N.E.2d 1110. If this court were to adopt defendant's position as to when the right of counsel attaches, that being prior to the initiation of adversary judicial proceedings, such a position would as the Ninth Circuit Court recognized "severely cripple the use of undercover methods to investigate crimes." *United States v. Kenny* (C.A.9, 1981), 645 F.2d 1323, 1338. Accordingly, defendant's fourth assignment of error is not well taken and it is therefore overruled.

Based upon the foregoing, defendant's assignments of error are not well taken and they are overruled. The judgment of the trial court is hereby affirmed.

*Judgment affirmed.*

BOWMAN, P.J., and TYACK, J., concur.