OPINION
Defendant-Appellant Edward S. Robinson appeals the Montgomery County Common Pleas Court's judgment convicting him of involuntary manslaughter and sentencing him to ten years of incarceration.
Gary Forsythe was shot and killed in his automobile on Sundale Avenue in Dayton, Ohio on February 22, 1997. On April 10, 1997, Robinson was indicted by the Montgomery County Grand Jury on one count of murder. Robinson had raised competency issues and an insanity defense in an unrelated aggravated robbery charge that had been concurrently pending against him, and he motioned the trial court to incorporate those issues into this case. In this case, Robinson was found to be incompetent on June 23, 1997, and after enduring treatment at Dayton Mental Health Center, he was found competent to stand trial on October 16, 1997. Prior to trial, Robinson filed a motion to suppress the eyewitness identifications arising out of the photo array. The trial court overruled Robinson's motion to suppress, finding that the photo array was not unfairly suggestive and that the identifications were reliable. Robinson filed a notice of alibi on July 20, 1998, and a jury trial commenced on July 27, 1998.
At trial, it was determined that at approximately 1 p.m. on February 22, 1997, a call was made to Forsythe's home by a male who was responding to an advertisement Forsythe had placed in the Trading Post selling his antique Smith Wesson 357 Magnum revolver. At the time, Forsythe was washing his light blue 1986 Oldsmobile, and Forsythe's live-in girlfriend, Kathy Epps, took the message. Soonafter, Forsythe received another call from a male inquiring about the revolver. As he spoke with the caller, Forsythe wrote the name "Mark" and "640-4946" on a piece of paper and placed it by the phone. As a result of that conversation, Forsythe left his home with the revolver. Epps, concerned with the geographical area to which Forsythe was headed, urged Forsythe to take her ".380 semiautomatic" for protection. Forsythe left the house with both firearms and never returned.
At approximately 2:15 p.m., Dorotella "Keya" Wills was visiting her aunt, Dorothy Phillips, at 3726 Roland Circle in Dayton, when they heard two or three gun shots. They proceeded onto the porch and watched a light blue Oldsmobile rolling from the parking lot down the hill and into a tree on Sundale Avenue, near Phillips' apartment building. They saw a Caucasian male in the driver's seat and an African-American male in the passenger's seat. Upon impact with the tree, the passenger's side door opened and the passenger exited the vehicle. The passenger ran toward the rear of the vehicle, turned around and returned to the vehicle. The passenger then reached his hand into the vehicle, turned and ran back to Roland Circle. Both witnesses stated that the suspect had been covering his hand with a navy blue hat as he ran between Phillips' building and the adjacent apartment building.
Wills described the suspect as having "a little face, braids." She stated that she had met the suspect a year prior to the incident and that his nickname was "Snoop" because he resembled "Snoop-Doggy-Dog," a "famous personality." Similarly, Phillips stated that the suspect was a young African-American male, between the ages of eighteen and twenty, with his hair in "french braids." Similar eyewitness testimony was provided by Sherron Whaley and Arlene Stevens. Whaley noted that the suspect was a slender man with braids and a "small structured face."
Detective Larry Davis, who was in charge of the scene, testified that there had been a lot of blood in the front seat of the car. While Det. Davis was investigating the crime scene, the canine unit arrived and tracked a scent which corresponded to the eyewitnesses' accounts of the suspect headed to Kings Mill Court. Officers entered an apartment in Dorham Place on Kings Mill Court and escorted four individuals to the Safety Building for questioning. Det. Davis used a photograph of one of the individuals, Jason Hargrove, as part of first photo array he provided to the eyewitnesses.
Det. Davis proceeded to Forsythe's home and told Epps what had occurred. Epps explained where Forsythe had been, and she gave Det. Davis the paper with the name "Mark" and the telephone number. Det. Davis attempted the telephone number and found that it was an active pager number. After some investigation, Det. Davis discovered that the pager was listed under Robinson's name.
By way of a court order, Ameritech records revealed that phone calls were made to Forsythe's number on the 22nd of February at 1:19 p.m. and at 1:38 p.m. Both calls were made from 937-278-7124, a phone located at 1623 Wesleyan Road in Dayton, Ohio. Karen Brown testified that she lived at 1623 Wesleyan Road, and that that number is her phone number. Ameritech records showed that these two calls were the only calls made from Brown's residence and the only calls made to Forsythe's residence between the hours of noon and 2 p.m. on February 22, 1997. Brown stated that she was not at home during the day on February 22, 1997, however she was at home the previous day and that there had been a trading magazine in her home on February 21, 1997 because her daughter was planning to purchase a new automobile.
Kellie Allen, Brown's daughter, had known Robinson for at least a year prior to February 22, 1997. At some point on February 22, 1997, Robinson visited Allen at her home and used her phone twice, but Allen had no knowledge of whom he had called and for what purpose. After using the phone, Robinson left her residence. He returned later with a scratch on his left cheek and a gash over his left eye. Allen stated that she had not seen Robinson with a hat that day, and that he had not had French braids in his hair that day.
Both Phillips and Wills chose Robinson from a photo array provided to them several days later by Detective Larry Davis. Whaley and Stevens chose Robinson from a photo array. Stevens chose Robinson because the "whole side of his face, the nose, the mouth right here, the hair, the eyebrow right here" all resembled the characteristics of the individual she had seen flee from the passenger side of the car in the afternoon of February 22, 1997.
Robinson was arrested on February 27, 1997. He had a three and a half inch healing wound on his left cheek, and a small cut in his left eyebrow.
Forensic scientist Timothy S. Duerr testified at trial. He examined a leather jacket, later determined to have been Forsythe's, and located two bullet holes, one on the shoulder area of the right sleeve, and one close to the cuff on the lower left-side of the wrist. A close inspection determined that the hole on the shoulder was an entrance hole resulting from a gun shot at close range, with a maximum of six inches of contact between the gun and the jacket.
Forsythe's vehicle was inspected by Dayton Police Department evidence technician Janette Byrns, who discovered a hole in the driver's side door from the interior armrest to the outside of the door. Det. Burns stated that there had been blood on the steering column, windshield, and driver's side door. A bullet was found on the sidewalk just outside of the driver's side door.
Forensic pathologist, Dr. Lee Lehman, performed the autopsy on Forsythe. Dr. Lehman determined that a bullet had passed through Forsythe's right shoulder, through the muscles of his chest into his chest cavity, through his sternum and into the interior of Forsythe's heart, creating a three inch hole in his heart. The bullet exited Forsythe's body on the left side of the chest cavity. Another bullet was found to have entered Forsythe's front left forearm, near his wrist, which exited out between the two bones in the arm on the underside of the forearm. There was no bruising or other indications that Forsythe had struck someone with any part of his body prior to his death. Dr. Lehman was not able to determine the range from which the bullets were fired at Forsythe. Dr. Lehman stated that Forsythe had died from a gun shot wound to the chest and the left forearm. Further analysis detected marijuana, cocaine, and either Xanax or Prozac in Forsythe's system prior to his death.
Three members of Robinson's family testified on Robinson's behalf. His mother, Sheila Payne, stated that on February 22, 1997, she had received two phone calls from Robinson, one at 12:45 p.m. and one at 1 p.m. During the second call, Robinson mentioned that he had been injured, but then Robinson's phone connection had been terminated. Payne called her brother, Victor Robinson, and promptly left her home in search of Robinson. After speaking with Payne, Victor Robinson proceeded to Kellie Allen's house, believing Robinson was there because he had been there earlier that day. Victor Robinson drove Robinson down Gettysburg Avenue, where they met Payne. As Robinson entered Payne's car, Payne noticed that Robinson had had a scratch on his face and on his eyebrow, had swelling around his mouth, and had scratches on his hands and his knuckles. She drove him to her mother's place where she had "cleaned his hands and stuff with the alcohol and ointments."
Payne testified that Robinson liked to change his hair styles often, but that day he had not worn his hair in braids but had had "twisted" pony tails. Payne also stated that Robinson had a pager, but that she had not seen him with his pager for a week. Victor Robinson testified that he could not recall what hairstyle Robinson had worn that day, but that Robinson might have been wearing pony tails or braids.
At the close of trial the jury found Robinson not guilty of murder, but guilty of the lesser included offense of involuntary manslaughter. The following day, the trial court sentenced Robinson to the maximum term of ten years incarceration. Robinson appeals his conviction and sentence, asserting six assignments of error.
 I. Appellant's conviction should be reversed in that he was denied effective assistance of counsel in violation of his Sixth Amendment right under the United States Constitution.
In his first assignment of error, Robinson argues that he was denied effective assistance of counsel because his trial counsel failed to properly raise an insanity defense, failed to object to prejudicial hearsay, and requested a "non-allowable lesser included offense."
To obtain a reversal of a conviction on the basis of ineffective assistance of counsel, the defendant must prove that (1) in light of all the circumstances, counsel's performance fell below an objective standard of reasonableness, and (2) counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome of the proceeding. Strickland v. Washington (1984), 466 U.S. 668, 687; State v. Madrigal (2000), 87 Ohio St.3d 387, 388-389. To establish the requisite prejudice, the defendant must show that there is a reasonable probability, a probability sufficient to undermine confidence in the outcome, that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Strickland, supra, at 694. A court reviewing a claim of ineffective assistance of counsel "must indulge in the presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 692; State v. Sallie (1998), 81 Ohio St.3d 673, 674. To overcome the presumption, the defendant must show that counsel made errors so serious that counsel failed to function as counsel guaranteed by the Sixth Amendment. Strickland, supra, at 692.
Prior to trial, Robinson filed a "Motion by counsel for Defendant suggesting incompetency," however the trial court overruled the motion. At the beginning of trial, Robinson's trial counsel renewed the motion along with a motion for the defense of not guilty by reason of insanity. The trial court found that Robinson was competent, but did not address the motion for the insanity defense. Because trial counsel failed to pursue a ruling on the insanity defense motion, Robinson argues that trial counsel was ineffective.
We note that "judicial scrutiny of counsel's performance must be highly deferential." State v. Bird (1998), 81 Ohio St.3d 582, 585, citing Strickland, supra, at 689. This court will not second-guess strategic decisions made by trial counsel. See State v. Mason (1998),82 Ohio St.3d 144, 161. See, also, Strickland, supra, at 690. In general, trial counsel's failure to pursue an insanity defense is not, per se, ineffective assistance of counsel. See State v. Decker (1986),28 Ohio St.3d 137, State v. Sneed (1992), 63 Ohio St.3d 3, and State v. Wong (1994), 95 Ohio App.3d 39. A person is not guilty of an offense by reason of insanity only if he proves that, at the time of the commission of the offense, he did not know, as a result of severe mental disease or defect, the wrongfulness of his acts. R.C. 2901.01(A)(14). The fact that the trial strategy selected proved to be unsuccessful does not equate per se to a denial of effective assistance of counsel. See State v. Frazier (1991), 61 Ohio St.3d 247, 255.
Robinson focuses on trial counsel's failure to pursue a ruling with the trial court on the insanity defense motion. We do not find that this rises to a claim of ineffective assistance of counsel. Robinson has failed to show any reasonable probability that an insanity defense would have succeeded, and thus he has not demonstrated that his trial counsel was ineffective. Robinson quotes portions of his competency hearing and his psychological evaluation that demonstrated his mental issues during the time period after the incident and prior to trial. However, he failed to allege and provide evidence that such mental instability existed at the time that Forsythe was killed. In addition, Robinson's case consisted of an alibi, and the State offered eyewitness testimony and circumstantial evidence to develop its case. It is acceptable trial strategy to offer a not guilty defense, and we will not second guess that strategy on appeal. We also agree with the State that pursuit of an insanity defense along with an alibi defense would have confused the jury, as the defenses directly conflict with one another. Accordingly, we overrule this portion of his first assignment of error.
Robinson also argues that trial counsel was ineffective for failing to object to the introduction of the paper with Forsythe's handwriting which contained the word "Mark" and the phone number "640-4946," as it was hearsay. Hearsay is an out-of-court statement or other declaration that is offered to prove the truth of its contents. Evid.R. 801(C). Hearsay evidence is generally inadmissible. Evid.R. 802. However, not every out-of-court declaration offered to prove the truth of its contents is "hearsay."
The State asserts that the evidence was not hearsay, as it was not offered to prove the truth of the matter. The State, however, fails to fully support this argument in its explanation. Regardless, even if this was hearsay, we find that this introduction did not rise to plain error, as a great amount of evidence exists linking Robinson to the incident, as we discuss in Robinson's fourth assignment of error. As such, we overrule this portion of Robinson's assignment of error.
Finally, Robinson argues that trial counsel's request for an instruction on the "lesser included offense" of negligent homicide constituted ineffective assistance of counsel, because negligent homicide is not a lesser included offense of murder. Although the request was not legally accurate, we do not find that this conduct rose to the level of ineffective assistance of counsel. Robinson also has failed to demonstrate how this line of conduct was a representation of his trial counsel's "ineffectiveness" throughout the trial. We cannot find that but for trial counsel's request, the outcome of trial would have been different.
Accordingly, Robinson's first assignment of error is overruled.
 II. The lower court erred in failing to sustain Appellant's motion to suppress the pretrial identification of the Appellant as well as the subsequent in court identification of the Appellant.
Robinson challenges the trial court's decision overruling his motion to suppress the photo identifications and their subsequent admission at trial. To warrant suppression of identification testimony, the accused bears the burden of showing that the identification procedure was "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification" and that the identification itself was unreliable under the totality of the circumstances. Simmons v. United States (1968), 390 U.S. 377, 384. See, also, Manson v. Brathwaite (1977), 432 U.S. 98, 106; Neil v. Biggers (1972), 409 U.S. 188, 199; State v. Broom (1988), 40 Ohio St.3d 277, 284; State v. Moody (1978),55 Ohio St.2d 64, 67. As we stated in State v. Keene (Sept. 20, 1996), Montgomery App. No. 14375, unreported,
 When an eyewitness to a crime is shown a series of photographs in an effort to identify a perpetrator, and the manner or mode of the presentation suggests that one individual is more likely than the others to be the perpetrator — such as when the photograph of one individual is in some way emphasized — undue suggestion may occur, increasing the likelihood of misidentification and violating the due process rights of a defendant so identified. Simmons v. United States (1968), 390 U.S. 377; Neil v. Biggers (1972), 409 U.S. 188; State v. White (Feb. 2, 1994), Clark App. No. 3057, unreported. Identification testimony tainted by an unduly suggestive out-of-court identification procedure may be suppressed. However, even if an identification procedure is unduly suggestive, the identification testimony derived therefrom is not per se inadmissible solely for that reason. Reliability of the identification is the linchpin in determining its admissibility. Manson v. Brathwaite (1977), 432 U.S. 98. As long as the identification itself is reliable, it is admissible despite the suggestive nature of the identification procedure. Neil v. Biggers, supra; Manson v. Brathwaite, supra; State v. Moody (1978), 55 Ohio St.2d 64 [9 Ohio Op.3d 71]; State v. White, supra. Reliability is determined from the "totality of the circumstances," which includes the witness' opportunity to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated, and the time between the crime and the identification procedure. Biggers, supra; Brathwaite, supra.
Robinson argues that the photo array was unduly suggestive because he was the only person depicted with "French braids pulled back," so that he most closely resembled the eyewitnesses' description of the suspect. Robinson further asserts that all of the eyewitnesses' identifications were unreliable because they had not observed the suspect's face "head on," and all had only viewed the suspect for a short period of time. According to Robinson, this unreliability was further supported by the eyewitnesses' statements that they had focused on the vehicle that had crashed into a tree and had not focused on the suspect's face, thus their degree of attention had been lacking. Robinson further challenges the reliability of the photo identifications based upon two eyewitness' choices of Jason Hargrove's picture from the first photo array shown by Det. Davis. Finally, Robinson argues that the identifications were unreliable because the eyewitnesses had provided "vastly different descriptions" of the suspect's height and shade of complexion.
The trial court overruled Robinson's claims, pointing out two factors that had prevented the photo array from being "unfairly suggestive" and that had supported the reliability of the identifications:
 First, the witnesses did describe the man's face, and all of them said they remembered the man's face, not just the braids. Second, in the explanation given to each of them, they were told that facial hair and hairstyle can be changed after the date of the picture was taken and the date of their observation of the suspect.
(Doc. No. 69, p. 2) The trial court also noted that the officers who presented the photo array to the eyewitnesses "did nothing to suggest a particular picture." Id.
We reviewed the photo array containing Robinson's picture, and we find that the trial court correctly determined that the photo array had been fair and had not been impermissibly suggestive. At trial, Det. Davis described his procedure for compiling the photo array and for presenting it to the victims. He and Det. Pearson chose pictures of individuals from the Montgomery County computer system who had the same or similar characteristics as Robinson and as described by the eyewitnesses. When presenting the photo arrays to the eyewitnesses he read the "Photographic Show-up Instructions," explaining that the individuals' facial hair and hairstyles might have changed. Each eyewitness indicated their understanding of the instructions.
Although Robinson was depicted with French braids, his was not the only photograph depicting a man in braids. Similarly, his was not the only picture depicting a man with a slender face, another distinguishing characteristic of the suspect. Based upon these facts, we do not find the photo array to be unduly suggestive.
We further find that the eyewitnesses' identifications, under the totality of the circumstances, were reliable and therefore the admissions were not erroneous. All eyewitnesses had the opportunity to view the suspect at a relatively close range in broad daylight. The eyewitnesses stated that they had seen the suspect's face from several different viewpoints, and that they had focused their attention on his facial characteristics. All described similar characteristics and stated that they had made their photo selection based upon those characteristics. Most of the eyewitnesses chose Robinson's photograph quickly and without any difficulty. Wills testified that she was certain Robinson was the suspect because she had met Robinson one year prior to the incident in her home. Wills specifically recalled the prior meeting because she had thought that Robinson had resembled "Snoop-Doggy-Dog."
At the motion to suppress, however, Det. Davis testified that two eyewitnesses had originally stated that Hargrove had resembled the suspect. Deonna Postell was one such eyewitness, however Det. Davis did not interpret her comment as a positive identification of Hargrove as the suspect. Stevens similarly believed that Hargrove resembled the suspect, but at the motion to suppress and at trial she stated that she had been unsure of Hargrove, but certain that Robinson had been the person she had seen exit the passenger side of the Oldsmobile.
Robinson also points to several inconsistencies in the eyewitnesses' descriptions of the suspect as further evidence of the unreliability of the identifications. Although the eyewitnesses' descriptions did vary slightly regarding height, complexion, and age of the suspect, they all stated that the suspect had braids. Additionally, Whaley, Stevens, and Wills had specified that the suspect had had a "slender face" with structured features.
In reviewing the circumstances surrounding the identifications of Robinson in this case, we are not convinced that there was "a very substantial likelihood of irreparable misidentification." Moody, supra, at 69, 9 Ohio Op.3d at 74, quoting Simmons v. United States, supra, at 384. Although some discrepancies existed in the witnesses' initial descriptions of the suspect, "these questionable areas in [the witnesses'] description[s] were particularly for the jury to decide." Simmons v. United States, supra, at 384, 9 Ohio Op.3d at 74, citing Manson, supra, at 116. Furthermore, all of the eyewitnesses at trial made in-court identifications of Robinson and testified that they had recognized Robinson based upon his characteristics and observations they had made during the incident.
Based upon the foregoing discussion, we find that the facts and circumstances of this case support the conclusion that the photo array was not unfairly suggestive and that the eyewitnesses' identifications of Robinson were reliable. As a result, the trial court properly overruled the motion to suppress the identifications, and properly admitted the identifications at trial.
Robinson's second assignment of error is overruled.
 III. The lower court deprived Appellant {sic} his liberty without due process of law in sentencing Appellant to the maximum sentence in the case at bar, when the court did not comport with Ohio's sentencing scheme and in failing to have adequate information from which to sentence the Appellant.
Robinson contends that the trial court sentenced him to the maximum term of incarceration without having reviewed a pre-sentence investigation. According to Robinson, this violates R.C. 2929.14(A), which states that for a conviction of a felony of the first degree, the period of incarceration is between three and ten years. Under R.C.2929.14(B), the shortest term should be given to an offender who has not previously served a prison sentence, "unless the court finds on the record that the shortest prison term will demean the seriousness of the offender's conduct or will not adequately protect the public from future crime by the offender or others." Furthermore, R.C. 2929.14(C) authorizes the maximum sentence as follows:
 only upon offenders who committed the worst forms of the offense, upon offenders who pose the greatest likelihood of committing future crimes, upon certain major drug offenders * * *, and upon certain repeat violent offenders[.]
Notably, the State concedes that the "record unfortunately fails to evidence the requisite statutory criteria," and that this situation would be appropriate for a remand to the trial court for re-sentencing.
Upon review of the record, we agree with Robinson and find that the trial court failed to enter the required findings under R.C. 2929.14(C) in order to impose a maximum prison term upon him.
Accordingly, we sustain Robinson's third assignment of error and remand this matter to the trial court for re-sentencing and for entering the appropriate findings for review under R.C. 2929.14(C).
 IV. The trial court erred in overruling Appellant's Criminal Rule 29 motion made at the conclusion of the State's case and renewed at the conclusion of the presentation of evidence, and in addition, Appellant's conviction for involuntary manslaughter was against the manifest weight of the evidence.
Robinson contends that the trial court erred in overruling his Crim.R. 29 motion for judgment of acquittal because his conviction was against the manifest weight of the evidence. Crim.R. 29(C) provides, in pertinent part:
 If a jury returns a verdict of guilty or is discharged without having returned a verdict, a motion for judgment of acquittal may be made or renewed within fourteen days after the jury is discharged or within such further time as the court may fix during the fourteen day period. If a verdict of guilty is returned, the court may on such motion set aside the verdict and enter judgment of acquittal.
Crim.R. 29(A) states that the trial court shall enter a judgment of acquittal "if the evidence is insufficient to sustain a conviction of such offense or offenses." A judgment of acquittal is inappropriate "if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt." State v. Bridgeman (1978),55 Ohio St.2d 261, syllabus, 9 Ohio Op.3d 401, syllabus. "`[S]ufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." State v. Thompkins (1997), 78 Ohio St.3d 380, 386, quoting Black's Law Dictionary (6 Ed. 1990) 1433. "On review for sufficiency, courts are to assess not whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." Id. at 390, (Cook, J., concurring).
Robinson's claim on appeal is actually that his conviction was against the manifest weight of the evidence. He asserts that he had a credible alibi defense, the State's evidence was incredible, there was a lack of physical evidence linking him to the crime, and there was a great amount of inconsistent evidence, thus his conviction was against the manifest weight of the evidence and it was error for the trial court to overrule his Crim.R. 29 motion. We do not agree.
 We note that in weight of the evidence challenges, an appellate court: [R]eview[s] the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.
Thompkins, supra, at 387, quoting State v. Martin (1983),20 Ohio App.3d 172, 175. While Thompkins explicitly permits this court to consider credibility when confronted with an argument that the verdict is against the manifest weight of the evidence, such consideration is not unbounded. We have explained the limited role of an appellate court in reviewing issues of credibility in weight of the evidence challenges as follows:
 Because the factfinder, be it the jury or * * * the trial judge, has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witnesses. Contrastingly, the decision as to which of several competing inferences, suggested by the evidence in the record, should be preferred, is a matter in which an appellate judge is at least equally qualified, by reason and experience, to venture an opinion. Therefore, although this distinction is not set forth in Thompkins, supra, we conclude that a decision by a factfinder as to which testimony to credit, and to what extent, is a decision that is entitled to greater deference than the decision as to how much logical force to assign an inference suggested by that evidence — in short, how persuasive it is.
State v. Lawson (Aug. 22, 1997), Montgomery App. No. 16288, unreported. Mindful of these principles, we turn to the merits of Robinson's assignment of error.
Robinson was convicted of involuntary manslaughter under R.C. 2903.04(A), to wit, causing the death of Forsythe as a proximate result of his committing or attempting to commit a felony. Identity of the perpetrator was a key issue in this case. In support of his argument, Robinson claims that the identification procedure was flawed and the identifications were incredible. As we stated in the second assignment of error, however, we do not agree that the identification procedure was improper.
Robinson also focuses on the lack of direct physical evidence linking him to the crime. We do find an overwhelming amount of circumstantial evidence of Robinson's guilt. Circumstantial evidence has the same probative value as direct evidence. Jenks, supra, at paragraph one of the syllabus. Forsythe died of a close-range gun shot wound to the chest and the left forearm. A forensic scientist testified at trial that the gun shot had been fired at a distance of no greater than six inches, thus supporting the State's theory that the passenger in Forsythe's vehicle had shot him. Thereafter, four eyewitnesses watched as Forsythe's vehicle rolled into a tree on Sundale Avenue, the passenger side door opened, and an African-American male exited the vehicle. All four eyewitnesses identified Robinson as the passenger.
Moreover, earlier that afternoon, two telephone calls had been made from Karen Brown's apartment to Forsythe's home, inquiring about the purchase of an antique revolver Forsythe had for sale. During one of the calls, Forsythe wrote the word "Mark" and the phone number "640-4946" on a piece of paper. The number was later discovered to be Robinson's pager number. Robinson was also found to have used Karen Brown's phone twice on the date of the incident.
Despite this evidence, Robinson focuses on the slight inconsistencies within the eyewitnesses' testimonies, and concludes that his conviction was against the manifest weight of the evidence. "A conviction is not against the manifest weight of the evidence solely because the jury heard inconsistent testimony. Credibility determinations on conflicting testimony are issues primarily reserved to the trier-of-fact to be second-guessed only in the most exceptional case." State v. McVay (Sept. 30, 1999), Franklin App. No. 98AP-1246, unreported. (Citations omitted.) Based upon this, we find that the jury had all of the evidence before it and had heard all of the inconsistencies. Despite these inconsistencies and Robinson's alibi testimony, the jury found beyond a reasonable doubt that Robinson had committed involuntary manslaughter. We will not disturb Robinson's conviction on appeal based upon those inconsistencies.
Accordingly, following a review of the entire record, weighing all the evidence and all reasonable inferences, and considering the credibility of the witnesses, we find no basis to believe that the jury lost its way, that a manifest miscarriage of justice occurred, or that Robinson's conviction was against the manifest weight of the evidence.
Robinson's fourth assignment of error is overruled. V. Appellant was denied his rights under the Sixth and Fourteenth Amendments of the United States Constitution as a result of the lower court's failure to ensure a representative cross-section of the community that participated in Appellant's trial, that being an essential component of the Sixth Amendment right to trial by jury.
Robinson claims that because there was only one African-American on the jury panel, he was denied the right to have his jury chosen from a fair cross-section of the community. We disagree. As we recently held in State v. Dunn (Sept. 29, 2000), Montgomery App. No. 16904, unreported,
 The Sixth and Fourteenth Amendments to the United States Constitution guarantee defendants a right to have a jury chosen from a fair cross-section of their community. Duren v. Missouri (1979), 439 U.S. 357; State v. Puente (1982), 69 Ohio St.2d 136, 138, 23 Ohio Op.3d 178, 179. However, this requirement of a fair cross-representation of the community need not be interpreted to mean that the array of the members of the venire consist of an exact cross-section of the community. Swain v. Alabama (1965), 380 U.S. 202; State v. Wilson (1972), 30 Ohio St.2d 199, 201, 59 Ohio Op.2d 220, 221. Furthermore, as the Ohio Supreme Court stated in State v. Strodes (1976), 48 Ohio St.2d 113, 115-116, 2 Ohio Op.3d 271, 271, vacated as to the death penalty (1978), 438 U.S. 911,
 Under the United States Constitution, a defendant is entitled not to a perfect cross-section of citizens for the jury panel, but only to panels selected by the best method that thoughtful men, who are cognizant of the practicalities of selection and the inherent problems involved, have been able to develop. State v. Johnson [(1972), 31 Ohio St.2d 106, 60 Ohio Op.2d 85]. * * * Unless prejudice to the defendant or the systematic and intentional exclusion of a group is shown, we will not reverse a judgment because of minor and technical defects in jury-selection procedures.
 To prove that a violation of this fair-cross section requirement has occurred, a defendant must show:
 (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.
Duren, supra, at 364.
It is indisputable that race is a constitutionally recognized distinctive group deserving of protection. Lockhart v. McCree (1986),476 U.S. 162, 175. However, as we stated in Dunn, supra,
 The United States Supreme Court has stated that they "impose no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive group in the population." Taylor v. Louisiana (1975), 419 U.S. 522, 538. Although the United States Supreme Court has declined to define "distinctive group," it has stated that:
 In our view, groups defined solely in terms of shared attitudes that would prevent or substantially impair members of the group from performing one of their duties as jurors * * * are not "distinctive groups" for fair-cross-section purposes.
Lockhart, supra, at 174.
Returning to the Duren analysis, Robinson must demonstrate that the representation of African-Americans in the venire from which his jury was selected was not fair and reasonable in relation to the number of African-Americans in the community. This element requires Robinson to "demonstrate the percentage of the community made up of the group alleged to be underrepresented, for this is the conceptual benchmark for theSixth Amendment fair-cross-section requirement." Duren, supra, at 364. However, in this case Robinson fails to support his claims. Robinson has provided no evidence of the statistical breakdowns of African-Americans on the panel available to him, and Robinson failed to provide evidence that the other panels drawn from the total voting population had consisted of a proportionately lower percentage of African-Americans than that represented in the community.
We also find that Robinson has not fulfilled the requirements of Duren's third prong, as he failed to produce evidence that there had been any "systematic exclusion" of African-Americans from his panel. However, even if we were to have found that African-Americans had been excluded from Robinson's panel, that is not the standard under Duren, supra. The court in Duren focused on exclusions within the entire jury selection process, and not necessarily only on one panel. Id. The Duren Court also stated that systematic exclusion means that the exclusion of the group is "inherent in the particular jury-selection process utilized." Id. at 366.
In this case, Robinson has produced no evidence of error by bias resulting in the intentional and systematic exclusion of African-Americans from his jury selection process. We therefore find that Robinson has failed to demonstrate that African-Americans were systematically excluded in the jury selection process.
Robinson's fifth assignment of error is meritless.
 VI. The Appellant was denied his constitutional and statutory rights to be present during all stages of the trial.
In his final assignment of error, Robinson argues that defense counsel's waiver of Robinson's presence during the in-chamber conference between the trial court and two witnesses who had violated the order to separate witnesses was a violation of his constitutional and statutory rights, as this was not a right which trial counsel could waive on Robinson's behalf.
In State v. Williams (1983), 6 Ohio St.3d 281, the Ohio Supreme Court held that "[t]he failure of the trial court to ensure a criminal defendant's presence at an in camera voir dire proceeding to determine a juror's fairness and impartiality is error." Id., at paragraph two of the syllabus. Although the court in Williams found such activity to be improper, it is important to note that the court did not find such error to be significant and one which required a reversal. The court found the act to be a "harmless violation of Crim.R. 43(A)," which governs a defendant's right to be present at every stage of the trial, and held that it was not prejudicial because Williams' due process rights had not been affected. Id. at 286. The court stated:
 For several reasons, appellant's "due process" rights were not appreciably impaired by his absence at the voir dire proceedings. First, his interests were more than adequately represented by his attorney who was present at the voir dire. Several federal circuit courts of appeals have recently faced analogous "due process" problems. The appellate court in Henderson v. Lane (C.A.7, 1980), 613 F.2d 175, 179, rejecting defendant therein's claim that the failure to secure his attendance at a proceeding to reinstate an alternate juror was reversible error, found his attorney's presence at the proceeding to be "[t]he most obvious barrier to prejudice in * * * [the] case." Similarly, the review court in United States v. Brown [(C.A.6, 1978), 571 F.2d 980,] 987, ruled that defense counsel's active participation in an in-chamber conference regarding the dismissal of a juror negated any prejudicial impact that might have resulted from defendant's absence during the discussion.
 Moreover, appellant's attendance at the voir dire would have contributed little to his defense. Appellant did not personally observe the improper communication, and his own conduct was not at issue in the proceeding. Finally, appellant's failure timely to object to his absence constituted a waiver of his right to be present, relieving this court of any duty to consider the issue. (Citations omitted.) That the privilege waived had constitutional implications is of no significance as such rights too, if not properly exercised, may lapse. (Citations omitted.)
Id. at 286-287. See, also, State v. Stephens (May 12, 2000), Montgomery App. No. 17851, unreported. Although our case involves an in-chamber conference with two witnesses instead of a juror, we find our case to be analogous to the facts in Williams. Both cases involved in camera discussions out of the presence of the defendants. The attorneys of both defendants were, however, present during both conferences and thus the defendants' interests were adequately protected.
Furthermore, this court has previously stated:
 Counsel is presumed to be authorized to act for his or her client. Therefore, an express waiver by counsel is sufficient to waive the right because the client's voluntary choice is implicit in and demonstrated by the waiver given by counsel. This express waiver exception also applies to Crim.R. 43(A).
Stephens, supra, quoting State v. Carr (1995), 104 Ohio App.3d 699,703. See, also, State v. Roe (1989), 41 Ohio St.3d 18, 27, citing United States v. Gagnon (1985), 470 U.S. 522.
In this case, defense counsel waived Robinson's presence during the conference and voir dire of the two witnesses who had violated the order to separate witnesses. The trial court conducted an examination of the witnesses and determined that both witnesses would be permitted to testify, but with some restrictions. Robinson does not claim that trial counsel's performance was impaired by the lack of his presence at the hearing, he does not claim that he was prejudiced by his absence, and he does not claim that his presence would have prevented an error from occurring. Instead, we find that Robinson's trial counsel lawfully waived his right to be present, and we hereby overrule Robinson's final assignment of error.
Judgment of the trial court affirmed in part, reversed in part, and remanded for re-sentencing in accordance with this opinion.
FAIN, J. and GRADY, J., concur.