[Cite as *State v. Johnson*, 2013-Ohio-1286.]

# IN THE COURT OF APPEALS

## ELEVENTH APPELLATE DISTRICT

## ASHTABULA COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | **CASE NO. 2012-A-0016** |
| DOMONIC D. JOHNSON, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal from the Ashtabula County Court of Common Pleas, Case No. 2011 CR 302.

Judgment: Affirmed.

*Thomas L. Sartini*, Ashtabula County Prosecutor, and *Shelley M. Pratt*, Assistant Prosecutor, Ashtabula County Courthouse, 25 West Jefferson Street, Jefferson, OH 44047 (For Plaintiff-Appellee).

*Judith M. Kowalski*, 333 Babbitt Road, #323, Euclid, OH 44123 (For Defendant-Appellant).

DIANE V. GRENDELL, J.

{¶1} Defendant-appellant, Domonic D. Johnson, appeals his conviction of Felonious Assault, following a jury trial in the Ashtabula County Court of Common Pleas. The issues before this court are whether a trial court errs by giving an instruction on complicity where the defendant is charged as a principal in the indictment, whether a minority defendant's right to an impartial jury is violated where no minorities sit on the jury, and whether a conviction for Felonious Assault is against the weight of the evidence/not supported by sufficient evidence where the only evidence of a weapon

being used is the victim's testimony, uncorroborated by the testimony of other witnesses and surveillance video. For the following reasons, we affirm Johnson's conviction.

{¶2} On September 29, 2011, Johnson was indicted by the Ashtabula County Grand Jury for Felonious Assault (Count One), a felony of the second degree in violation of R.C. 2903.11(A)(2), alleging that he "did knowingly cause or attempt to cause physical harm to another, to-wit: David Scott, by means of a deadly weapon or dangerous ordnance, to-wit: brass knuckles"; and for Felonious Assault (Count Two), a felony of the second degree in violation of R.C. 2903.11(A)(1), alleging that he "did knowingly cause serious physical harm to-wit: broke ribs, punctured spleen of David Scott."

{¶3} On October 7, 2011, Johnson appeared for arraignment and entered a plea of not guilty.

{¶4} On February 14 and 15, 2012, Johnson was tried before a jury. At trial, the following testimony was presented:

{¶5} James D. Oatman, Jr., the records clerk and terminal agency coordinator for the Ashtabula Police Department, testified and authenticated a recording of 911 calls played for the jury. There were two 911 calls made on July 7, 2011, reporting a fight at the Circle K convenience store at the corner of Main Avenue and West 58th Street, in Ashtabula, Ohio. A third 911 call was made on July 15 by David Scott, advising law enforcement that one of the men who had assaulted him was seen walking on Main Avenue near the Circle K.

{¶6} David Scott testified that, in the early morning hours of July 7, 2011, he was at the Domino's Pizza, adjacent to Circle K, with his wife and child. A "big guy" in an orange shirt, later identified as Cody Webb, approached from the parking lot and

2

accused Scott of being "the guy who pulled that gun on my friend," while pointing behind him. Scott protested that he "had the wrong guy," and tried to enter the Circle K, but the doors were locked. Then, another "guy rode up on a bike and he was a black individual with a[n] orange stripe in his hair," later identified as Johnson. Scott testified that, prior to this time, he was not acquainted with either Johnson or Webb. Scott retreated into the parking lot.

{¶7} Scott recalled "vividly" that Johnson pulled brass knuckles out of his jacket and struck him in the head: "I remember clear as day he reached into his pocket and puts up his hands, and he has a row of metal objects which was, I could clearly see it was brass knuckles. * * * I'll never forget the sound that it made. It made a pinging sound * * *. It was like being hit in the head with a baseball bat."

{¶8} Scott began to run through the parking lot pursued by Johnson and Webb, and followed by his wife. Another individual in the parking lot tripped Scott as he ran past. On the ground, Scott was kicked repeatedly in the face and side, but was not "a hundred percent" sure that Johnson kicked him. Scott, believing the assault was finished, rose to his knees and saw Johnson above him: "I specifically saw him swing down. And he had the brass knuckles in his hand, and hit me * * * and my face started pouring * * * blood."

{¶9} Surveillance video from Circle K was played for the jury. The video, beginning at 1:01:32 a.m., depicts Scott backing up as Webb approaches him, gesturing behind him. Scott tries to open the door to Circle K. Johnson, on a bike, and Scott's wife follow behind Webb. Scott walks behind a car followed by Webb, while Johnson gets off the bike and runs around the other side of the vehicle. Scott retreats to a second vehicle followed by his wife, Johnson, and Webb. At this point, Scott testified he

3

was struck for the first time. Scott's wife falls to the ground and Scott begins to run around the second vehicle and towards the gas pumps, while pursued by Johnson and Webb. As Scott passes the gas pumps, he is tripped by a bystander. Scott falls and is no longer in view of the surveillance camera. Johnson and Webb continue after Scott beyond the camera's view. At 1:02:40 a.m., Johnson returns to his bicycle and departs.

{¶10} Following the assault, Scott was taken by ambulance to Ashtabula County Medical Center. His wounds included abrasions to both elbows and knees, three broken ribs, and a lacerated spleen. On the right side of his face, there was a hematoma about three inches in length from the eyebrow to the ridge of the forehead. On the left side of his head, there were abrasions and a large cut in the skin, in the shape of a crescent-moon, behind the eye. Photographs of Scott's injuries and medical records were introduced into evidence.

{¶11} Cody Webb testified for the State, in exchange for the recommendation of a two-year prison sentence for his Felonious Assault conviction as part of a plea bargain with the State. Webb testified that, on the night in question, he overheard Johnson arguing with Scott because Scott had put a gun to Johnson's head. Johnson left to obtain a gun and retaliate against Scott. After Johnson left, Webb confronted Scott and asked him "if he pulled a pistol out on Domonic." Webb testified he had never seen Scott before. Initially, Webb chased Scott because he "wanted him and Domonic to solve their problems." At some point, Scott called Webb a racial epithet and spit on him. After that, Webb went after Scott in anger.

{¶12} Webb testified that Johnson returned to the Circle K in about five minutes. They chased Scott and, by the second vehicle, Johnson hit Scott, but Webb did not notice if Johnson had anything in his hand, such as brass knuckles. After Scott tripped

4

and fell, Webb kicked him in the ribs. Webb could not recall kicking Scott more than once because he was "angry," in a "blackout" state-of-mind. Webb testified that Johnson did not kick Scott and did not tell or encourage him to confront Scott. According to Webb, he and Johnson acted independently in their pursuit of Scott.

{¶13} Patrolman James Hildebrand of the Ashtabula Police Department responded to the 911 call on July 7 and found Scott inside the Domino's Pizza. Hildebrand testified that Scott was "yelling that he was in excruciating pain, holding his side, holding his head." There was also a large amount of blood on the floor coming from Scott's head and other injuries.

{¶14} Patrolman Hildebrand responded to the July 15 911 call when Webb was identified by Scott. Webb admitted to attacking Scott.

{¶15} Following the State's case, Johnson moved for acquittal pursuant to Criminal Rule 29. The trial court denied the motion.

{¶16} Johnson testified on his own behalf. Johnson claimed that he knew Scott prior to the July 7 incident because Scott had threatened him with a gun a few days earlier. When he saw Scott at Circle K on the night in question, Johnson identified him to a companion, Derek Hamilton, as the one who threatened him. Johnson then departed on his bicycle to his mother's house to obtain a phone charger. When he returned, he found Webb and Scott talking outside the door to Circle K. Without knowing what they were discussing, Johnson jumped off his bike to confront Scott. Although he chased Scott with Webb through the parking lot, Johnson denied assaulting or even touching Scott. When tripped, Scott "slid on his whole face." Thereupon, Webb began to punch and kick Scott, but he took no part in this, unwilling to "touch anybody who falls on the ground."

5

{¶17} Following the testimony, the trial court instructed the jury, including an instruction on Complicity, over defense counsel's objection.

{¶18} The jury found Johnson guilty of both Counts in the Indictment.

{¶19} On April 19, 2012, a sentencing hearing was held. The trial court merged the convictions for purposes of sentencing and ordered Johnson to serve a prison term of three years, and advised him of a period of post-release control.[1] On April 24, 2012, a written Judgment Entry of Sentence was issued.

{¶20} On May 9, 2012, Johnson filed his Notice of Appeal. On appeal, Johnson raises the following assignments of error:

{¶21} "[1.] The Trial Court erred to the prejudice of the Appellant, by permitting the State to add a charge of complicity at the end of the Trial, even though the Appellant was not indicted on a complicity charge, and instructing the jury as to complicity, thus depriving the Defendant of his right to due process of law."

{¶22} "[2.] The Defendant was denied his Sixth Amendment right to a jury trial, by reason of the fact that the jury impaneled in this case was not a fair representative cross-section of the community as required by the Sixth and Fourteenth Amendments of the United State Constitution."

{¶23} "[3.] The Defendant was denied his right to the effective assistance of Counsel pursuant to the Sixth Amendment of the United States Constitution, when his Counsel failed to present evidence establishing that the jury impaneled in this case was

---

1. We note that "the State * * * decide[s] which of the two charges will merge with the other." *State v. Burrell*, 11th Dist. No. 2009-P-0060, 2011-Ohio-2091, ¶ 72, citing *Maumee v. Geiger*, 45 Ohio St.2d 238, 244, 344 N.E.2d 133 (1976) ("[t]he choice is given to the prosecution to pursue one offense or the other, and it is plainly the intent of the General Assembly that the election may be of either offense"). In the present case, the trial court merged the Assault convictions "into one conviction for the purpose of sentencing," without indicating whether Johnson's sentence was for "causing serious physical harm" or for "use of a deadly weapon."

6

not a fair representative cross-section of the community as required under the Sixth and Fourteenth Amendments."

**{¶24}** "[4.] The trial court erred in denying appellant's motion for acquittal pursuant to Ohio Crim.R. 29."

**{¶25}** "[5.] The convictions are against the manifest weight of the evidence."

**{¶26}** In the first assignment of error, Johnson argues the trial court erred by "add[ing] a charge of complicity at the end of the Trial," although "the Appellant was not indicted on a complicity charge, * * * thus depriving the Defendant of his right to due process of law."   Johnson relies upon the proposition that "[t]he purposes of an indictment are to give an accused adequate notice of the charge, and enable an accused to protect himself or herself from any future prosecutions for the same incident."  *State v. Buehner*, 110 Ohio St.3d 403, 2006-Ohio-4707, 853 N.E.2d 1162, ¶ 7.  Johnson asserts that his Indictment did not give him proper notice that he would be charged for complicity, which the State did not raise until after the presentation of the evidence.[2]

**{¶27}** The Ohio Supreme Court has effectively ruled that an indictment need not include a complicity charge in order to secure a conviction on that theory.

**{¶28}** "A charge of complicity may be stated in terms of this section, or in terms of the principal offense."  R.C. 2923.03(F).  "Thus, a defendant charged with an offense may be convicted of that offense upon proof that he was complicit in its commission, even though the indictment is 'stated * * * in terms of the principal offense' and does not

---

2.  In fact, during the State's opening statement, it was argued before the jury that the evidence would show that Johnson was guilty, "not only of using a brass knuckle, a weapon, and causing physical harm, but of aiding and abetting and assisting if not doing it himself, Cody Webb in the spleen injury and the rib fracture.  * * * [I]n 68 seconds you will see that [Johnson] was step by step with Cody Webb doing every bit of this assault, and should be found just as guilty as Cody Webb in this, in addition to having the brass knuckles himself for Count 1."

7

mention complicity. R.C. 2923.03(F) adequately notifies defendants that the jury may be instructed on complicity, even when the charge is drawn in terms of the principal offense." *State v. Herring*, 94 Ohio St.3d 246, 251, 762 N.E.2d 940 (2002); *State v. Keenan*, 81 Ohio St.3d 133, 151, 689 N.E.2d 929 (1998) (rejecting the argument that instructing the jury on complicity alters the charge in the indictment without notice); *State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, ¶ 181 (rejecting the argument that a complicity instruction was improper where the State amended the bill of particulars to charge complicity at the close of the evidence); *In re A.T.*, 11th Dist. No. 2010-L-114, 2011-Ohio-5104, ¶ 48 ("[i]ntroduction of complicity for the first time at closing arguments is generally acceptable because the defendant is considered to be on notice via R.C. 2923.03(F)").

{¶29} We also reject Johnson's argument that the evidence did not support an instruction on complicity. The evidence at trial demonstrated that the attack on Scott was a concerted effort by Johnson and Webb, in that both of them confronted Scott about an alleged threat, and pursued him with the purpose of inflicting physical harm. *State v. Tuff*, 11th Dist. Nos. 2010-L-082 and 2010-L-083, 2011-Ohio-6846, ¶ 53 ("an instruction on complicity is justified when the evidence could be interpreted to support alternative findings as to the exact role of the defendant").

{¶30} The first assignment of error is without merit.

{¶31} The second and third assignments of error are intertwined. In the second assignment, Johnson claims the impaneled jury did not represent a fair cross-section of the community, in that there were no African Americans in the jury pool. In the third assignment, Johnson claims trial counsel was ineffective for not presenting statistical

8

evidence demonstrating that the impaneled jury was not a fair cross-section of the community.

{¶32} The Sixth Amendment to the United States Constitution guarantees "the right to a speedy and public trial, by an impartial jury." *Duncan v. Louisiana*, 391 U.S. 145, 149, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968) (the Sixth Amendment is binding on the states). "[T]he selection of a petit jury from a representative cross section of the community is an essential component of the Sixth Amendment right to a jury trial." *Taylor v. Louisiana*, 419 U.S. 522, 528, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975); *Smith v. Texas*, 311 U.S. 128, 130, 61 S.Ct. 164, 85 L.Ed. 84 (1940) ("[i]t is part of the established tradition in the use of juries as instruments of public justice that the jury be a body truly representative of the community"). The holding that "petit juries must be drawn from a source fairly representative of the community * * * impose[s] no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population"; "[d]efendants are not entitled to a jury of any particular composition." *Taylor* at 538.

{¶33} "In order to establish a violation of the fair representative cross-section of the community requirement for a petit jury array under the Sixth and Fourteenth Amendments to the United States Constitution, a defendant must prove: (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that the representation is due to systematic exclusion of the group in the jury-selection process." *State v. Fulton*, 57 Ohio St.3d 120, 566 N.E.2d 1195 (1991), paragraph two of the

9

syllabus, citing *Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979).

{¶34} During jury selection in the present case, defense counsel noted that "my client is African American" and "[i]t doesn't look like there was any African American jurors on the entire potential panel." The trial court responded:

{¶35} You know, we mentioned that this morning. When these people were checking in -- we've had 4 jury trials I think since first of the year, and we have had African Americans on every single one of them. Probably one of them we had 3. Usually it's been about 2. Sometimes 1. The last time anybody actually did a real challenge to the make up of the panels it was determined that a percentage of minority populations, and particularly including African American[s] on our jury panels as a whole were consistent with a percentage of the population. So as I said, last time anybody's tested it, it appeared that the panels are not discriminating. But of course since it's a random selection we never know for sure who we're gonna get for a given trial. And it just, it's amazing. Since the first of the year there's been representation of minority members on the jury panel. And today, I agree, looking at the panel it doesn't appear that there's anyone there who's African American. But I still think the panel is fairly drawn, based on whatever information we have. And so your objection or your observation is noted for the record.

10

{¶36} In Ashtabula County, "[t]he names of potential jurors shall be drawn from the list of electors certified annually by the Ashtabula County Board of Elections, using an automated process that assures random selection procedures throughout the jury selection process and that provides each eligible person with an equal probability of selection." Local Rule 27(C).

{¶37} The Ohio Supreme Court has held: "The use of voter registration rolls as exclusive sources for jury selection is constitutional and 'does not systematically, [or] intentionally, exclude any [economic, social, religious, racial, political and geographical group of the community].'" *State v. Moore*, 81 Ohio St.3d 22, 28, 689 N.E.2d 1 (1998), citing *State v. Johnson*, 31 Ohio St.2d 106, 114, 285 N.E.2d 751 (1972).

{¶38} Johnson does not argue that the absence of African Americans in the jury pool for his trial was due to systematic exclusion in the jury-selection process; nor is there any evidence of systematic exclusion. "Where * * * the trial court relies upon voter registration lists, the defendant-appellant 'must demonstrate that the voter-registration qualifications are suspect, or that the jury-selection procedure is administered in a discriminatory manner.'" (Citation omitted.) *State v. Jones*, 91 Ohio St.3d 335, 340, 744 N.E.2d 1163 (2001). Where such evidence is lacking, a Sixth Amendment claim fails. *Id.*

{¶39} The second assignment of error is without merit.

{¶40} In the third assignment of error, Johnson contends that trial counsel was constitutionally deficient for not introducing evidence regarding the numbers of African Americans living in Ashtabula County.

{¶41} To reverse a conviction for ineffective assistance of counsel, the defendant must prove "(1) that counsel's performance fell below an objective standard

of reasonableness, and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome of the proceeding." *State v. Madrigal*, 87 Ohio St.3d 378, 388-389, 721 N.E.2d 52 (2000), citing *Strickland v. Washington*, 466 U.S. 668, 687-688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

{¶42} In the present case, there is no evidence that defense counsel's performance fell below an objective standard of reasonableness or that Johnson was prejudiced by counsel's performance. Essential to a legitimate Sixth Amendment claim is evidence of systematic exclusion, which is wholly lacking in this case. Assuming, arguendo, that the racial composition of Johnson's jury pool did not fairly represent the community, this fact does not constitute a violation of the Sixth Amendment. *State v. McNeill*, 83 Ohio St.3d 438, 444, 700 N.E.2d 596 (1998) ("underrepresentation on a single venire is not *systematic* exclusion"); *Jones*, 91 Ohio St.3d at 340, 744 N.E.2d 1163 ("[a]ppellant must do more than show that his particular panel was unrepresentative"). As noted above, potential jurors in Ashtabula County are chosen at random from the list of electors. The Ohio Supreme Court has repeatedly held that such a method is not inherently unconstitutional. *Jones* at 340; *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 106 ("the calling of venires from voter registration lists * * * does not systematically exclude blacks from the jury-selection process.").

{¶43} While Johnson's jury did not include African Americans, the numbers in prior trials ranged from one to three, a relatively small percentage of the array of potential jurors. These numbers demonstrate a degree of consistency in the percentage of African Americans serving on juries in Ashtabula County, suggesting that the absence of African Americans in Johnson's jury was, at best, a not especially

12

improbable aberration. In the absence of any indication of systematic exclusion of African Americans from the jury pool, trial counsel is not ineffective for failing to introduce statistical evidence that African Americans were underrepresented on his particular jury (presuming, of course, that the statistical evidence would have shown underrepresentation).[3]

{¶44} The third assignment of error is without merit.

{¶45} In the fourth and fifth assignments of error, Johnson challenges his convictions on the grounds of sufficiency and manifest weight of the evidence.

{¶46} The manifest weight of the evidence and the sufficiency of the evidence are distinct legal concepts. *State v. Elmore*, 111 Ohio St.3d 515, 2006-Ohio-6207, 857 N.E.2d 547, ¶ 44. With respect to the sufficiency of the evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, following *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

{¶47} Whereas "sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support a verdict as a matter of law, * * * weight of the evidence addresses the evidence's effect of inducing belief." *State v. Wilson,* 113 Ohio St.3d 382, 2007-Ohio-2202, ¶ 25, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386-387, 678 N.E.2d 541 (1997). "In other words, a reviewing court asks whose evidence is more persuasive -- the state's or the defendant's?" *Id.* An appellate court

---

3. According to 2010 Census data, the total population of Ashtabula County was 101,497, with 3,586 African Americans, roughly 3.5% of the total population.
http://factfinder2.census.gov/bkmk/table/1.0/en/DEC/10_DP/DPDP1/0500000US39007 (accessed March 26, 2013).

considering whether a verdict is against the manifest weight of the evidence must consider all the evidence in the record, the reasonable inferences, the credibility of the witnesses, and whether, "in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1983).

{¶48} In order to convict Johnson of Felonious Assault, the State had to prove, beyond a reasonable doubt, that he "knowingly * * * [c]ause[d] * * * physical harm to another * * * by means of a deadly weapon" under Count One; and "knowingly * * * [c]ause[d] serious physical harm to another" under Count Two. R.C. 2903.11(A)(2) and (1) respectively. Johnson could also be found guilty if it were proven that he did knowingly "[a]id or abet another in committing the offense." R.C. 2923.03(A)(2).

{¶49} Johnson contends there was insufficient evidence that he used a deadly weapon under Count One because "the victim's testimony" was the only evidence "that brass knuckles were used." On the contrary, Scott's testimony that Johnson used brass knuckles is sufficient evidence of the fact, inasmuch as this testimony, if believed, proved the use of a deadly weapon. Johnson's arguments that no other witnesses attested to the use of brass knuckles, the surveillance video did not record the use of brass knuckles, and Scott was under heavy sedation following the attack, go to the credibility, i.e., the manifest weight of the evidence, rather than its sufficiency.

{¶50} Johnson contends there was insufficient evidence that he caused Scott physical harm under Count Two because there was no evidence that he "caused Mr. Scott's broken ribs and punctured spleen." On the contrary, Johnson's testimony that he and Webb "blocked him off [from retreating]," and Webb's testimony that they

14

"corner[ed] him," is sufficient evidence that Johnson aided and abetted Webb in breaking Scott's ribs/puncturing his spleen, inasmuch as the joint pursuit of Scott enabled Webb to eventually commit the actual assault.

{¶51} The fourth assignment of error is without merit.

{¶52} In the fifth assignment of error, Johnson argues his convictions are against the manifest weight of the evidence, noting that the only evidence of brass knuckles being used was Scott's testimony, and he admitted that his memory of some of the details of the incident was "sketchy"; Scott returned to the scene of the crime, again with his wife and child late at night, a week after the incident; the trial court acknowledged that the injuries to Scott's head could have been caused by kicking; and the surveillance video of the incident, as well as still photographs made therefrom, is of poor quality and does not show Johnson hitting or kicking Scott.

{¶53} While these arguments impinge on the credibility of the State's evidence, they do not render Johnson's convictions a manifest miscarriage of justice. Scott admitted that some things are sketchy "when you get kicked and beat," but affirmed that he remembered certain things vividly, and he "could clearly see it was brass knuckles." The fact that Scott returned to Circle K within a week of the attack does little to impeach his credibility in light of the fact that Scott does not drive, is on disability, and lives nearby. The trial court did acknowledge that Scott's facial injuries could have been caused by kicking, but also that "they seem consistent with exactly the way [Scott] described it," i.e., he was hit by Johnson with brass knuckles. Finally, while the surveillance video does not show the actual injuries being caused, it definitely shows concerted action by Johnson and Webb in the pursuit of Scott. The existence of Scott's injuries is uncontroverted. Scott and Webb testified that Johnson hit Scott, and that

15

Webb kicked him. There is nothing improbable about the conclusion that Johnson caused the injuries to Scott's face and aided/abetted Webb in causing the injuries to his ribs and spleen.

{¶54} The fifth assignment of error is without merit.

{¶55} For the foregoing reasons, Johnson's conviction for Felonious Assault in the Ashtabula County Court of Common Pleas, is affirmed. Costs to be taxed against appellant.

TIMOTHY P. CANNON, P.J.,

THOMAS R. WRIGHT, J.,

concur.

16